1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   THOMAS R. KAUFMAN, Cal. Bar No. 177936
2  tkaufman@sheppardmullin.com
   DANIELLE L. LEVINE, Cal. Bar No. 280390
3  dlevine@sheppardmullin.com
4  1901 Avenue of the Stars, Suite 1600
   Los Angeles, California 90067-6017
5  Telephone:  310-228-3700
   Facsimile:   310-228-3701
6
7  Attorneys for Defendant
   LAWRENCE SERVICE COMPANY
8

9              UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11

| 12  DANA GREEN, Individually and on behalf of all similarly situated employees of Defendants in the State of California. | Case No. CV12-06155 JAK (VBKx) |
| --- | --- |
| 13 | Assigned to Hon. John A. Kronstadt |
| 14      Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LAWRENCE SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT |
| 15           v. | |
| 16  LAWRENCE SERVICE COMPANY d.b.a. LAWRENCE MERCHANDISING SERVICES, and DOES 1-50, Inclusive | |
| 17 | Date:        May 6, 2013 |
| 18      Defendants. | Time:        8:30 a.m. Ctrm:        750 |
| 19 | [Notice of Motion, Appendix of Evidence, and Statement of Uncontroverted Facts and Law Filed Concurrently Under Separate Covers] |
| 20 | |
| 21 | |
| 22 | |

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...............................1

II.   RELEVANT FACTS .............................................................................3

    A.   The Nature of LMS's Business and the Merchandiser Position Plaintiff Held...............................................................................3

    B.   How LMS Notifies Merchandisers of Employment Policies .................4

    C.   How Plaintiff Scheduled, Performed and Was Paid for the Merchandising Projects She Performed for LMS...................................5

        1.   Merchandisers' Flexibility in Scheduling Work Hours ...............5

        2.   LMS's "Project Pay" System for Merchandisers .........................7

    D.   How Plaintiff Reported Her Work Hours to LMS..................................8

    E.   The Time Worked Outside the Store That Plaintiff Falsely Contends LMS Did Not Compensate ....................................................10

        1.   Time Spent Reading Project Instructions ...................................11

        2.   Time Spent Completing Post-Service Online Surveys...............11

        3.   Time Spent Uploading Pictures to the MARS Website .............11

    F.   Facts Relevant to Plaintiff's Claim That She Was Denied Reimbursement of Expenses under Labor Code Section 2802 ...........12

    G.   Facts Relevant to Plaintiff's Claims for Denial of Meal and Rest Periods..............................................................................................13

    H.   Facts Relevant To Plaintiff's Claims Concerning Her Wage Statements .........................................................................................14

    I.   The Termination of Plaintiff's Employment .......................................15

III.    LEGAL ANALYSIS ....................................................................... 15

    A.   LMS Is Entitled to Summary Judgment as to Plaintiff's State and Federal Minimum Wage Claims ........................................................... 15

        1.   Plaintiff's Federal Claim Under the FLSA .................................. 15

        2.   Plaintiff's State Law Minimum Wage Claim ............................ 15

    B.   LMS Is Entitled to Summary Judgment on Plaintiff's Overtime Claim Because She Lacks Evidence She Ever Worked Overtime ....... 17

    C.   LMS Is Entitled to Summary Judgment as to the Meal and Rest Period Claims Because LMS Provided Meal and Rest Periods .......... 18

    D.   LMS Is Entitled to Summary Judgment as to Plaintiffs' Claims That She Was Denied Expense Reimbursement ................................... 19

        1.   Plaintiff Has No Claim For Reimbursement of Computer, Camera, Telephone or E-Mail Access Because She Already Owned All of Those Items for Personal Use ............... 20

        2.   Plaintiff Has No Claim for Mileage Reimbursement Because All Mileage She Incurred Was Either Commute Miles or Not "Necessary" Within the Meaning of the Law ....... 21

        3.   Plaintiff Has No Claim for Other Individual Expenses Because She Failed to Make use Of LMS's Expense Reimbursement Policy ................................................................ 21

    E.   LMS Is Entitled to Summary Judgment as to Plaintiff's Waiting Time Penalties Claim Because She Lacks Evidence That LMS Willfully Failed to Pay Her All Wages Owed at Discharge ................. 22

    F.   LMS Is Entitled to Summary Judgment as to Plaintiff's Wage Statement Claim Because Plaintiff Never Experienced an "Injury" Within the Scope of Labor Code Section 226 ....................... 23

    G.   LMS Is Entitled to Summary Judgment as to Plaintiff's Claim for That It Failed to Keep Proper Records of Her Meal Periods ............... 24

    H.   LMS Is Entitled to Partial Summary Judgment as to Plaintiff's Derivative UCL and PAGA Claims ...................................................... 24

IV.    CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Adair v. City of Kirkland*
    185 F.3d 1055 (9th Cir. 1999) .......................................................................... 15

*Balasanyan v. Nordstrom, Inc.*
    2012 U.S. Dist. LEXIS 181350 (S.D. Cal. Dec. 20, 2012) ............................... 15, 16

*Novak v. Boeing Company*
    2011 U.S. Dist. LEXIS 83031 (C.D. Cal. Jul. 20, 2011) .......................................... 19

*Sullivan v. Kelly Services*
    2009 U.S. Dist. LEXIS 96544 (N.D. Cal. Oct. 16, 2009) ................................... 21

*Wilson v. Kiewit Pacific Co.*
    2010 U.S. Dist. LEXIS 133304 (N.D. Cal. 2010) .............................................. 19, 21

State Cases

*Armenta v. Osmose*
    135 Cal. App. 4th 314 (2005) .......................................................................... 15

*Bell v. Farmers Insurance Exchange*
    115 Cal. App. 4th 715 (2004) .......................................................................... 16

*Bright v. 99¢ Stores*
    189 Cal. App. 4th 1472 (2010) ........................................................................ 24

*Brinker Restaurant Corp. v. Superior Court*
    53 Cal. 4th 1004 (2012) .................................................................................. 18

*Cassady v. Morgan, Lewis & Bockius*
    145 Cal. App. 4th 220 (2006) .......................................................................... 19

*Gattuso v. Harte-Hanks Shoppers, Inc.*
    42 Cal. 4th 554 (2007) ................................................................................. 19, 21

*Mamika v. Barca*
    68 Cal. App 4th 487 (1998) ............................................................................. 22

*Morgan v. Wet Seal, Inc.*
    210 Cal. App. 4th 1341 (2012) ........................................................................ 19

-iii-

*Muldrow v. Surrex Solutions Corp.*
   208 Cal. App. 4th 1381 (2012) ................................................................. 18

*Price v. Starbucks Corp.*
   192 Cal. App. 4th 1136 (2011) ..................................................... 22, 23, 24

*Smith v. Rae-Venter Law Group*
   29 Cal. 4th 345 (2002) ............................................................................ 22

<u>State Statutes</u>

Labor Code § 201 .......................................................................................... 22

Labor Code § 203 .......................................................................................... 22

Labor Code § 226 ................................................................................ 2, 22, 23

Labor Code § 226.7 ....................................................................................... 18

Labor Code § 510 .......................................................................................... 16

Labor Code § 512 .......................................................................................... 18

Labor Code § 1198 ............................................................................. 2, 23, 24

Labor Code § 2802 ........................................................................ 12, 19, 20, 21

I.        <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiff Dana Green ("Plaintiff") worked for Defendant Lawrence Service Company ("LMS") as a merchandiser from 2002 to 2011.  This is a non-exempt position where Plaintiff received assignments to go into retail stores to perform specific merchandising tasks such as setting up a jewelry display.  Plaintiff has now filed class claims against LMS on behalf of all California merchandisers arising from the manner in which LMS compensates merchandisers.  Based on her admissions at deposition, however, all of her claims fail as a matter of law, at least in her individual case.

First, Plaintiff's claims for minimum wage fail.  She has no federal minimum wage claim because she lacks evidence that her effective hourly rate for any week fell below the federal minimum wage.  For her state law claim, her effective hourly rate was also always above the state minimum, and she lacks evidence that merchandisers perform substantial work that is not covered by their "project pay."

Second, Plaintiff's claim for unpaid overtime fails.  Plaintiff worked only a few hours per day and ***reported*** more than eight hours in a day (divided over several smaller projects) on only a handful of occasions.  But she admitted at deposition that she regularly falsified her time records to report ***double*** the hours she actually worked on her Target projects.  When the reported hours are reduced to the true work hours, Plaintiff never worked enough hours to qualify for overtime pay.  As such, LMS is entitled to summary judgment on that claim.

Third, Plaintiff's claims for meal and rest periods fail.  The evidence is undisputed that Plaintiff was free to perform her assignments at any weekday she chose at any time between 8:00 a.m. and 5:00 p.m. within a window of a week or more and could take as many breaks as she wanted.  Plaintiff admits she was aware of the meal and rest period laws from when she started at LMS in 2002 and that nobody ever told her she could not take meal or rest breaks or thwarted her attempts to do so.  Those admissions doom her meal and rest claims.

DEFENDANT'S MOT. FOR SUMMARY JUDGMENT

Fourth, Plaintiff's claims for expense reimbursement all fail.  LMS has since 2008 had a written expense reimbursement policy in the Employee Manuals it provided to Plaintiff that notified merchandisers they could submit necessary expenses for reimbursement.  Plaintiff admits she never made use of the reimbursement mechanism or even raised the issue of reimbursement with LMS.  In addition, although Plaintiff pleaded that merchandisers were required to purchase a camera, computer, e-mail account, and internet access to work at LMS, she admitted at deposition that she had already purchased all those items for personal use before the relevant limitations period.  In short, she has no evidence that would entitle her to recover further expense reimbursement from LMS in this lawsuit.

Fifth, Plaintiff's claim for failure to pay all final wages fails because Plaintiff lacks evidence she was owed more wages than she was paid at termination.  She also lacks evidence that LMS lacked a reasonable basis for believing that it had paid her all the wages she was owed at that time.

Sixth, Plaintiff's claim for failure to provide accurate wage statements fails because she lacks evidence that she experienced any "injury" from LMS's alleged technical non-compliance with Labor Code Section 226.

Seventh, Plaintiff's claim for failure to maintain meal period records fails because there is no private right of action under the IWC Wage Order or Section 1198 for failure to maintain meal period records.  Furthermore, Plaintiff testified that she never took a meal period at any point during her employment with LMS, so LMS cannot be held liable for failing to record meal periods that never occurred.

Lastly, Plaintiff's derivative claims under the state Unfair Competition Law ("UCL") and Labor Code Private Attorney General Act ("PAGA") all fail for the same reasons that the underlying claims fail.

For each of the foregoing reasons, LMS respectfully requests that the Court enter summary judgment in its favor, or enter partial summary judgment as to each of Plaintiff's claims that the Court agrees fails as a matter of law.

## II.   RELEVANT FACTS

### A.   The Nature of LMS's Business and the Merchandiser Position Plaintiff Held

LMS is in the business of providing merchandising services to both retailers and manufacturers in retail locations nationwide.  Such merchandising services include, but are not limited to setting out jewelry in a retail store, setting out brochures, or simply straightening a merchandise display.  LMS's clients contract with LMS to send merchandisers (formally referred to as "Service Representatives") to perform merchandising tasks in the retail stores.[1]

Plaintiff worked for LMS as a merchandiser from 2002 until May 13, 2011.[2] For the relevant period of this motion, which is from January 1, 2008 until May 13, 2011, merchandiser job duties were described in the 2006 version of the job description.[3]  That job description indicates that the merchandiser is a part-time position tasked to "perform various merchandising duties with various products/displays in local retail stores according to instructions/hotlines provided by [LMS] via mail, email, phone and our web-based system (MARS)."  The job description also indicates that the hours worked on the position can be "anywhere from a 1 hour project to 20 hours per week." [4]

When a merchandiser performs a project, the job duties are *not* limited only to service time in the retail store.  Rather, merchandisers receive instructions that inform them that, in addition to their in-store duties, they must also complete an online survey that answers questions concerning the service performed.  The actual

---

[1]      Declaration of Susan Schmidt ("Schmidt Dec.") ¶ 2.

[2]      Deposition of Dana Green ("Pltf. Dep.") 42:24-43:2, 49:18-24, 55:20-23.  All cited pages of Plaintiff's deposition are included in the Appendix of Evidence as Exhibit B.

[3]      Schmidt Dec. ¶ 3; Pltf. Dep. 126:2-127:3; Ex. C.  All references to "Exhibits" are to the like-lettered exhibits within the concurrently filed Appendix of Evidence.

[4]      Schmidt Dec. ¶ 3; Ex. C.

survey questions that the merchandiser must answer are typically set forth within the instructions that the merchandiser receives in the mail prior to starting the project.[5]

### B.   How LMS Notifies Merchandisers of Employment Policies

When new merchandisers begin working for LMS, LMS sends them a Service Representative Employee Manual ("the Employee Manual") that sets forth some of the main company policies that employees are expected to follow.[6]  During the period relevant to this motion, there were four different versions of the Employee Manual in existence at different times: a 2004 version, a December 2008 revision, a December 2009 revision, and a June 2010 revision.[7]

Plaintiff understood that the Employee Manual applied to her but that it did not have the answer to every issue that could arise on the job.[8]  This is consistent with what the Employee Manual itself states.  In the December 2008 revision, the Employee Manual states that it "is not an exhaustive list of every workplace rule and policy, but rather a guide to Service Representatives on commonly raised questions."[9]  On the last page, the Employee Manual provides a 1-800 number for Human Resources which employees are encouraged to call for questions with "employment policies," "new hire paperwork," "processing payroll" and "other topics."[10]  Similar language appears in the 2004, 2009 and 2010 versions.[11]

Plaintiff was always aware that she could call HR to ask employment related questions.[12]  Although Plaintiff contacted HR about certain medical leave and workplace harassment issues that arose during her employment, she never called to

---

[5]      Schmidt Dec. ¶ 6; Ex. H.
[6]      Schmidt Dec. ¶ 5.
[7]      Schmidt Dec. ¶ 5; Exs. D, E, F, and G.  There were 2011 and 2012 revisions as well, but they were after Plaintiff last performed work for LMS.
[8]      Pltf. Dep. 61:6-15, 89:11-20, 93:12-17.
[9]      Schmidt Dec. ¶ 5; Ex. E, p. 7.
[10]     Schmidt Dec. ¶ 5; Ex. E, p. 24.
[11]     Schmidt Dec. ¶ 5; Ex. D, pp. 2, 10; Exs. F and G, pp. 3, 5, 24, 25.
[12]     Pltf. Dep. 71:3-14.

ask questions about such issues as meal or rest breaks, overtime pay or expense reimbursement.[13]

### C. How Plaintiff Scheduled, Performed and Was Paid for the Merchandising Projects She Performed for LMS

#### 1. Merchandisers' Flexibility in Scheduling Work Hours

Plaintiff was initially attracted to merchandising work at LMS because of the flexibility LMS gave her in selecting her work hours.[14]  Pursuant to LMS's practice of assigning merchandisers only to stores near their homes, Plaintiff was assigned to two Target stores— one in Lancaster and one in Palmdale.[15]  The distance from her home to the Lancaster store was 8 minutes and to Palmdale was 15-18 minutes.[16]  There was never any traffic that substantially increased these travel times.[17]

Plaintiff received word of her assignments through the internet-based MARS system.[18]  Typically, Plaintiff had more than a week to complete a project from the time she was notified of the project, and she was free to select any date and time that the store was open before that far-off deadline to perform the project.[19]  Furthermore, if Plaintiff felt she could not complete a project by the stated deadline, she could call LMS and obtain extra time to complete the project.[20]

Near the very end of her employment, the MARS system was replaced with one called Natural Insight, which operated in substantively the same way except that merchandisers indicated on the system the date they expected to perform a project.[21]

---

[13]    Pltf. Dep. 71:15-72:4, 85:4-8, 90:13-16, 94:9-95:19, 96:22-97:11, 106:20-107:3, 107:10-14, 146:23-147:13.

[14]    Pltf. Dep. 47:11-48:11.

[15]    Pltf. Dep. 49:25-50:19.

[16]    Pltf. Dep. 50:20-51:24.

[17]    Pltf. Dep. 51:11-15.

[18]    Pltf. Dep. 109:2-22.

[19]    Pltf. Dep. 62:23-63:19.

[20]    Pltf. Dep. 130:4-15.

[21]    Pltf. Dep. 122:9-123:18, 124:9-23.

1    Even under this new system, however, a merchandiser was free to perform the

2    project earlier than the day that the merchandiser designated on Natural Insight.[22]

3         For each project Plaintiff was assigned, she received official written

4    "instructions" that explained the tasks she was to perform and the survey questions

5    she would need to answer to complete the project.[23]  Since 2008, LMS has had a

6    general practice of mailing instructions to merchandisers so that they do not need to

7    print them out themselves.  Nonetheless, merchandisers can review online and print

8    out extra copies of instructions from the LMS website if they do not receive or lose

9    the instructions.  Although reviewing the instructions at home is optional,

10   merchandisers are generally expected to bring the instructions to the store with them

11   to consult as necessary while performing the in-store service.[24]

12        Because of the great flexibility given to merchandisers, Plaintiff could decide

13   whether she wanted to service her two stores the same day or on different days, and

14   could decide whether to complete multiple projects in the same store on same days

15   or on different days.[25]  According to the time she reported to LMS, Plaintiff reported

16   working an average of 15.4 hours on LMS projects per week between January 1,

17   2008 and when she stopped working for LMS in May 2011.[26]

18        Plaintiff's preference was to start in the morning, and she only occasionally

19   worked in a store into the early afternoon.[27]  Nobody at LMS ever instructed her to

20   visit two separate stores on the same day.  Rather, Plaintiff sometimes worked in

21   both stores in the same day because she liked completing her work over fewer

22   days.[28]  Plaintiff combined projects so as not to make excessive trips to the store, but

23   _____

24   [22]    Pltf. Dep. 123:1-18.

     [23]    Schmidt Dec. ¶ 6; Pltf. Dep. 62:23-63:19, 108:16-109:1.

25   [24]    Schmidt Dec. ¶ 7.

26   [25]    Pltf. Dep. 121:19-122:2, 133:3-14.

     [26]    Schmidt Dec. ¶ 8; Ex. I.

27   [27]    Pltf. Dep. 135:16-136:20.

28   [28]    Pltf. Dep. 121:19-122:2, 133:3-14.

admits she could have done each project on a different day if she wanted.[29]  When completing all open projects in a store in one day took too long, Plaintiff would sometimes save projects for a different day and return to do them later.[30]

### 2.   LMS's "Project Pay" System for Merchandisers

LMS informed Plaintiff early on in her employment that pay would be "per project," meaning that there would be an estimated project time and she would receive a project amount calculated at an hourly rate multiplied by the estimated project hours.[31]  As Plaintiff put it, she was told that she "would be paid a certain amount whether I completed the project within that amount—within that—time frame," and this amount was based upon "an estimate of how much time a project should take."[32]  Plaintiff understood that, if she finished the project faster than the estimated time, she would still receive the full amount of the project pay.[33]  For example, a project estimated to take one hour might pay $10, but the merchandiser would receive the full $10 even if the project only took 20 minutes to complete.[34]

However, in the unusual case when a project took *longer* than the estimate, Plaintiff could call LMS and obtain extra hourly pay at a rate of about $10 per hour for the excess time.  Plaintiff understood, at least since January 1, 2008, that if a project took her longer than the estimated time, she could call LMS and receive extra hourly pay for the excess time.[35]  Plaintiff took extra time on only about 10-15% of her projects.[36]  Plaintiff testified that 99% of the time that she asked for extra

---

[29]   Pltf. Dep. 133:3-14.
[30]   Pltf. Dep. 138:6-139:9.
[31]   Schmidt Dec. ¶ 9; Pltf. Dep. 58:20-25, 59:16-60:5.
[32]   Pltf. Dep. 59:1-60:5.
[33]   Pltf. Dep. 60:6-9.
[34]   Schmidt Dec. ¶ 9.
[35]   Pltf. Dep. 78:21-79:10.
[36]   Pltf. Dep. 76:14-19.

pay because her assignment ran long, LMS paid her for the extra time.[37]  In fact, it has been LMS's general practice to pay the extra pay when a merchandiser reports time in excess of the estimate even where the merchandiser failed to call to request additional hourly pay while in the middle of the service on the project (as they are requested to do).[38]

### D. How Plaintiff Reported Her Work Hours to LMS

Because merchandisers are non-exempt employees who work without supervision, they are on an honor system to report their work time accurately to LMS.[39]  As stated above, if a merchandiser's reported time is less than the project estimate, then the merchandiser still receives the full project rate for the project.[40] Because of LMS's project pay system, if a merchandiser falsely reports that he or she worked the entire estimated project time, but actually works fewer hours, it has no impact on the merchandiser's pay except in the very rare circumstance where the total time reported exceeds eight hours in a day and pushes the employee into a daily overtime situation.[41]  Plaintiff reported more than eight hours in a day on only fourteen (14) occasions between January 1, 2008 and May 13, 2011, and never once reported more than ten hours in a day.[42]

Despite the fact it usually has no impact on the wages paid on a project, LMS has instructed merchandisers accurately to report the work time they spent on each project.[43]  Plaintiff admits that LMS told her that she was supposed to report the hours she *actually worked* to LMS, but even after Plaintiff received that instruction,

---

[37]   Pltf. Dep. 78:15-79:3.

[38]   Schmidt Dec. ¶ 9.

[39]   Schmidt Dec. ¶ 10.

[40]   Schmidt Dec. ¶ 10; Pltf. Dep. 117:4-13.

[41]   Schmidt Dec. ¶ 11; Pltf Dep. 73:20-74:7.

[42]   Schmidt Dec. ¶¶ 12-13; Ex. J.

[43]   Schmidt Dec. ¶ 10.

1  Plaintiff continued to report to LMS the total estimated project time when her total

2  work time was significantly *less* than this estimate.[44]

3    This overstating of work hours was not a rare occurrence for Plaintiff, but

4  happened on *75%* of Plaintiff's projects.[45]  Project estimates are set with some slack

5  time such that efficient merchandisers routinely finish assignments quicker than the

6  estimated time.[46]  Plaintiff explained that this was true for her because most of her

7  LMS projects were Target jewelry projects that tended to be the same each week.

8  She became efficient with these projects over time.[47]  When she started doing them

9  in 2002, she took the full estimated time to complete them, but within a few months

10 she was much more efficient and could complete them in about *half* the time.[48]  If

11 Plaintiff's time on jewelry projects were reduced from the full estimated amount to

12 60% of that amount, it reduces her hours to less than eight hours in each of the ten

13 occasions where the sum of her reported time for the day exceeded eight hours.[49]

14   Separate from what she reported to LMS for purposes of calculating her

15 wages, when Plaintiff visited a store, she was supposed to record her work time in a

16 log book in the store.[50]  As with the time she reported for compensation purposes,

17 Plaintiff's regular practice was to record in the log book that she spent the full

18 estimated project time in the store even when she spent much less.[51]  At deposition,

19 Plaintiff described one situation where she reported in the log book and to LMS that

20 she worked three hours on a Target project when she actually spent only 1.5 hours.[52]

---

21   [44]  Pltf. Dep. 72:24-75:3.

22   [45]  Pltf. Dep. 77:21-78:8.

23   [46]  Schmidt Dec. ¶ 9.

  [47]  Pltf. Dep. 42:3-23.

24   [48]  Pltf. Dep. 43:11-25, 60:10-14, 69:2-4.

25   [49]  Schmidt Dec. ¶¶ 14; Ex. J.

26   [50]  Pltf. Dep. 80:11-18.

27   [51]  Pltf. Dep. 81:10-84:18, 116:19-118.2.

  [52]  Pltf. Dep. 163:1-22; Declaration of Thomas R. Kaufman ("Kaufman

28 Dec.") ¶ 4; Ex. B-6.

        DEFENDANT'S MOT. FOR SUMMARY JUDGMENT

It is particularly noteworthy that, despite the fact Plaintiff contends in this lawsuit that the time estimated for projects does not cover the time merchandisers need to spend reading instructions and accessing the MARS system, Plaintiff admits that the total time that she worked for LMS— inside and outside a retail store— may have been *less* than what she reported and was paid wages on:

> Q.     So I'm asking you, if you added up for your entire -- let's start from January 1st, 2008 forward, all the time you wrote in the vendor log books added up.
>
> A.     Right.
>
> Q.     Is that more or less than all the time you actually worked for LMS if you know? If the answer is I don't know, you can say that too.
>
> THE WITNESS: I -- I really don't know.[53]

**E.     The Time Worked Outside the Store That Plaintiff Falsely Contends LMS Did Not Compensate**

Plaintiff was unable to identify any communication she ever received from LMS that her project pay excluded the time she spent checking for assignments on MARS, reading instructions before going to a store visit, or completing a survey after performing a merchandising service.  To the contrary, on page 21 of the 2008, 2009 and 2010 versions of the Employee Manual, it states that LMS "pay[s] by the project NOT by the hour" and that merchandisers "are responsible for completing **all** tasks described in the project instructions within every project [they] are assigned to."[54]  The instructions typically notify merchandisers that they must complete a survey after they leave the store.[55]

Plaintiff could not recall any work she performed for LMS beyond reading instructions, driving to and from stores, performing work in the stores, and

---

[53]     Pltf. Dep. 175:12-177:11 (attorney objections omitted).
[54]     Schmidt Dec. ¶¶  5; Ex. E, p. 21; Ex. F, p. 21; Ex. G, p. 21.
[55]     Schmidt Dec. ¶ 6; Ex. H, pp. 1-2.

completing the survey after the project.[56]  Nonetheless, she has asserted a claim here that tasks she performed outside the store were somehow uncompensated.  The following summarizes her testimony about those allegedly uncompensated tasks:

### 1.    Time Spent Reading Project Instructions

Plaintiff testified that LMS mailed her instructions for her projects, and she brought them to the store with her.[57]  Plaintiff testified that the time she spent reading instructions for a project ranged from about 1 to 10 minutes, depending on the complexity of the project.[58]  She also admitted that she was free to wait to read the instructions until she arrived at the store if she wanted to do so.[59]

### 2.    Time Spent Completing Post-Service Online Surveys

As referenced above, merchandisers are instructed that, after completing the in-store service on a project, they must log into MARS/Natural Insight and complete a project survey that includes questions on the hours worked on the project (this is how merchandisers report their work hours to LMS).  Plaintiff estimated that this process typically took about four (4) minutes to complete for an average project.[60]

### 3.    Time Spent Uploading Pictures to the MARS Website

In more recent years, LMS has asked merchandisers on *certain* assignments to take pictures of the area where they worked and to upload the pictures to the MARS website.  LMS has never instructed employees to use a particular type of camera or to use flash photography, but rather has always stated that any camera— even one on a cell phone—would suffice.[61]  Plaintiff admits that when pictures were required as part of a project, she could take pictures using either her cell phone

---

[56]    Pltf. Dep. 121:7-15.

[57]    Pltf. Dep. 108:16-109:1 (Plaintiff could not recall any instance where they did not mail her the instructions), 131:14-19 (brought instructions to store the majority of the time).

[58]    Pltf. Dep. 102:23-104:11.

[59]    Pltf. Dep. 104:12-16.

[60]    Pltf. Dep. 114:20-116:18.

[61]    Schmidt Dec. ¶ 15; Pltf. Dep. 143:3-144:13.

DEFENDANT'S MOT. FOR SUMMARY JUDGMENT

camera or her digital camera and then upload them to the MARS system.[62]  Plaintiff testified that, to upload the pictures, she would have to click an icon on the MARS website, and then it would take about 7-8 minutes for all of her pictures to upload.[63]

**F.     Facts Relevant to Plaintiff's Claim That She Was Denied Reimbursement of Expenses under Labor Code Section 2802**

LMS's Employee Manuals have, since 2008, contained a general expense reimbursement provision that allows merchandisers to submit expenses for reimbursement.  At page 22 of the 2008, 2009 and 2010 versions of the Employee Manual, LMS expressly instructed merchandisers of its reimbursement policy:

> "SUBMITTING EXPENSES TO LMS: There may be an occasion where you will incur an expense while working for LMS. Some examples of expenses could be: faxes that you had to pay a fee to send and parking in major metro areas.  You must provide us the original receipt for the expense to our office before we can reimburse you.  On every receipt, please be sure to include your full name, rep number, store # and the project name you were servicing when you incurred the expense."[64]

It has always been LMS's policy to consider submissions on a case-by-case basis to determine whether they were truly reasonable and necessary.[65]  Despite this policy, Plaintiff never attempted to submit an expense for reimbursement or even to discuss the topic of expense reimbursement with anyone at LMS.[66]

Plaintiff was not required to buy any new equipment since January 1, 2008 to perform her job duties at LMS.  Since 2006, Plaintiff owned a computer at home she could use for LMS.[67]  She used the same computer for personal internet use about

---

[62]     Pltf. Dep. 141:1-19.

[63]     Pltf. Dep. 113:25-114:3, 141:10-142:24.

[64]     Schmidt Dec. ¶¶ 5, 16; Ex. D, p. 22; Ex. E, p. 22; Ex. F, p. 22.

[65]     Schmidt Dec. ¶ 16.

[66]     Pltf. Dep. 106:20-107:14.

[67]     Pltf. Dep. 23:16-24:10.

1   three (3) hours per day.[68]  In fact, Plaintiff had high speed internet on her home

2   computer since 2006.[69]  She also had a personal e-mail account through America

3   Online since 1998.[70]  Since 2006, she has owned a cell phone with a camera that she

4   received as a gift.[71]  Separate from the camera on her phone, Plaintiff has had access

5   to her son's digital camera that she bought him as a gift in 2006.[72]  Plaintiff has also

6   owned a printer/scanner since before 2008 that she used for personal purposes.[73]

7        The only time that Plaintiff ever purchased an item to perform an assignment

8   for LMS involved her purchasing a $3 duster for one project, and she never asked

9   LMS if they would reimburse her for it or asked the store if they had a duster she

10  could use for the project.[74]  Plaintiff typically received project instructions in the

11  mail (in fact, she could not remember a case when she did not), but she testified she

12  chose to print an average of about 6-10 pages of instructions per week on her home

13  printer (an expense of less than $1 per week).[75]

14  **G.   Facts Relevant to Plaintiff's Claims for Denial of Meal and Rest Periods**

15       When Plaintiff worked at LMS, the subject of meal and rest periods was not

16  directly addressed in the Employee Manual.  This was because individual projects

17  are so short and the total work day rarely lasts the five hours that would trigger an

18  obligation to provide a meal period.  For rest periods, LMS always built extra time

19  into any project expected to last more than 3.5 hours so that employees would have

20

21

22  ─────────────────

23  [68]      Pltf. Dep. 24:11-25:7.
    [69]      Pltf. Dep. 25:17-26:8.
24  [70]      Pltf. Dep. 32:25-33:11.
25  [71]      Pltf. Dep. 28:14-23.
26  [72]      Pltf. Dep. 30:24-31:11.
    [73]      Pltf. Dep. 33:12-34:14.
27  [74]      Pltf. Dep. 105:4-107:5.
28  [75]      Pltf. Dep. 108:16-109:1, 112:3-113:7.

extra time to take rest breaks.  On the rare occasion when employees would inquire about breaks, it was LMS's practice to encourage them to take breaks.[76]

From when she started at LMS, Plaintiff knew California had meal and rest period laws, and she understood that the law allowed her to take a 10 minute break after 2 or 3 hours of work, but she never discussed the issue with anyone at LMS.[77] She did her typical jewelry projects weekly, but twice a year would do her longest projects, called "jewelry resets," that could last four to five hours.[78]  The only times Plaintiff ever worked more than five hours in a day were when she strung together multiple shorter projects that she was free to complete on separate days or with interspersed breaks of any length she wanted.[79]

## H.    Facts Relevant To Plaintiff's Claims Concerning Her Wage Statements

Plaintiff opted to receive her checks through direct deposit, which meant that her wage statements were available electronically through LMS's website.[80] Plaintiff knew she could also easily access through the MARS system a list of all the projects she had performed and how much she was paid for each one.[81]  Although Plaintiff never had a question about her wage statement, she knew that if she did, she could have obtained an answer to her question from HR.[82]

---

[76]    Schmidt Dec. ¶ 17; *see also* Declaration of Brigitte Harris ¶ 7 (California merchandiser who testifies that LMS informed her that she could take breaks when she inquired); Declaration of Brenda Fearon ¶ 8 (another California merchandiser who testifies that LMS "reminded [her] to take breaks.")

[77]    Pltf. Dep. 46:13-47:1.

[78]    Pltf. Dep. 65:4-10, 139:10-16.

[79]    Pltf. Dep. 85:12-86:5, 137:7-15.

[80]    Pltf. Dep. 65:22-23, 146:5-19; Kaufman Dec. ¶ 4, Ex. B-19 (exemplar wage statement).

[81]    Pltf. Dep. 145:2-19.

[82]    Pltf. Dep. 146:23-147:19.

I.      The Termination of Plaintiff's Employment

Plaintiff last performed worked for LMS in May 2011.  She then went on a medical leave from which she did not return, but her employment was not formally terminated in July 2011.[83]  As of the time of Plaintiff's termination LMS was unaware that it owed her any additional wages beyond what it was paid and Plaintiff made no concurrent demand for further wages at that time.[84]

III.  **LEGAL ANALYSIS**

A.      **LMS Is Entitled to Summary Judgment as to Plaintiff's State and Federal Minimum Wage Claims**

1.      **Plaintiff's Federal Claim Under the FLSA**

An employer violates the FLSA minimum wage provisions only where the total paid to the employee for a week divided by total hours worked falls below the federal minimum wage ($7.25 since 2009).  *Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999); *Balasanyan v. Nordstrom, Inc.*, 2012 U.S. Dist. LEXIS 181350 (S.D. Cal. Dec. 20, 2012) ("The Ninth Circuit has interpreted FLSA as rejecting 'any minimum wage claim employees might have brought if their salary, when averaged across the total time worked, still paid above the minimum wage.").

As set forth in Plaintiff's pay records, she was consistently paid at a rate of more than $10 per hour even if you accept as accurate the inflated work hours she reported on projects.[85]  There is no evidence that her total hours worked ever were enough to reduce her hourly rate below $10.00 per hour, let alone below minimum wage.  Thus, LMS is entitled to judgment on the FLSA minimum wage claim.

2.      **Plaintiff's State Law Minimum Wage Claim**

California minimum wage law differs from the FLSA only in two respects: (1) the minimum wage is higher (it has been $8.00/hr. since January 1, 2008); and

---

[83]      Schmidt Dec. ¶ 4; Pltf. Dep. 55:24-56:5.

[84]      Schmidt Dec. ¶ 4.

[85]      Schmidt Dec. ¶ 8, Ex. I.

(2) an employer violates the minimum wage if an employee performs work beyond a *de minimis* amount that is uncompensated.  *See Armenta v. Osmose*, 135 Cal. App. 4th 314, 323-24 (2005).

For example, if an employee is paid on straight commission such that he or she earns pay only by engaging in sales activities, if the employer tasks the employee with separate non-sales activities without paying hourly pay for those non-sales activities, that may violate California law.  *See Balasanyan*, 2012 U.S. Dist. LEXIS 181350 at *16-17 (Nordstrom employees paid straight commission not being compensated for stocking work that is separate from sales work).  By contrast, for a sales employee, tasks performed that have connection to sales, such as tasks designed to facilitate future sales, are properly encompassed in the employee's commission.  *Id.* at *17 (citing *Muldrow v. Surrex Solutions Corp.*, 208 Cal. App. 4th 1381, 1392 (2012)).

The undisputed facts here show that all of the work that Plaintiff seeks to treat as "uncompensated" is, in fact, directly connected to completing "projects" for LMS, and is not some wholly separate task.  Performing a project is not limited just to in-store service, but also entails accessing MARS to look up an assignment, reading the instructions, and completing a survey for the client at the end of the project.  Plaintiff admits that the time she was allotted per project greatly exceeded her in-store work time.  Plaintiff also admits LMS instructed her to record ***all*** the time she worked.  Plaintiff has no evidence that anyone at LMS ever told her that the project rate was intended only to cover in-store work.

In sum, the evidence is undisputed that all of Plaintiff's work time was compensated and that the total compensation received divided by total hours work never fell below the state or federal minimum wage.  Accordingly, LMS is entitled to summary judgment on Plaintiff's minimum wage claims.

**B.** **LMS Is Entitled to Summary Judgment on Plaintiff's Overtime Claim Because She Lacks Evidence She Ever Worked Overtime**

An employee in California is entitled to receive premium overtime pay when the employee works more than eight hours in a day. Lab. Code § 510(a). To prevail on an overtime claim, it is the employee's burden to prove that she actually worked more than eight hours in a day. While the burden as to the precise amount of overtime may be relaxed in certain circumstances, the employee always maintains the burden of proving that he or she worked overtime in the first instance. *See Bell v. Farmers Insurance Exchange*, 115 Cal. App. 4th 715, 749-50 (2004).

Here, Plaintiff admits that HR instructed her to report all her work time, but she ignored the instruction and generally reported the full project time notwithstanding her practice of working only about half that amount.

> Q.    Did you ever contact HR to ever discuss how to report your time?
>
> A.    There was an instance where I was reporting the full project hours. If it was a three-hour project I'd put the full three hours. ***And I was -- I was told that you put down your exact hours of work.*** So if you worked two hours, you put down two hours. And -- but I would always put the full hours.
>
> Q.    From what -- from what period -- okay, let me go back. You -- you would put down the full hours -- if I understand what you're saying, means if the project is supposed to be three hours, you would put down three hours, correct?
>
> A.    That's correct, yes.
>
> Q.    When did you stop that practice of just putting down the full amount of three hours and instead putting down fewer hours if you actually got it done quicker?

SMRH:408064737.4                                     DEFENDANT'S MOT. FOR SUMMARY JUDGMENT

1           A.     I -- I don't -- I don't remember even if I did

2           because I didn't understand it.[86]

3        Plaintiff further testified that she routinely could complete her projects in

4   about half the project estimated time.  Despite this gross inflation of her work hours,

5   Plaintiff reported more than eight total hours in a day on only fourteen occasions

6   since January 1, 2008, and never reported more than ten hours.[87]  Given her

7   admission that she falsified her own time to almost double her work hours, she lacks

8   evidence that there was ever a single case where she actually worked more than

9   eight hours in a day.  Because Plaintiff cannot meet the initial burden of proving she

10  worked overtime hours, LMS is entitled to summary judgment on her overtime

11  claim.

12      **C.**    **LMS Is Entitled to Summary Judgment as to the Meal and Rest**
               **Period Claims Because LMS Provided Meal and Rest Periods**

13       Labor Code Section 512 requires that employers provide employees with 30-

14  minute off-duty meal periods when they work more than five hours in a day.  Labor

15  Code Section 226.7 allows an employee to recover penalty pay when an employer

16  fails to "provide an employee a meal or rest period" as required under a governing

17  IWC Wage Order.  The California Supreme Court has held that an employer

18  satisfies the duty to "provide" a meal period when it relieves the employee of duty

19  to work "with the employee thereafter at liberty to use the meal period for whatever

20  purpose he or she desires."  The duty to "provide" does not require, however, that

21  the employer "ensure that no work is done."  *Brinker Restaurant Corp. v. Superior*

22  *Court*, 53 Cal. 4th 1004, 1016 (2012); *see also Muldrow*, 208 Cal. App. 4th at 1398

23  ("an employer need only *provide* for meal periods, and need not *ensure* that

24  employees take such breaks.")  An employer fails to provide a meal period only

25  when the employer "exert[s] coercion against the taking of, creat[es] incentives to

26  

27      [86]    Pltf. Dep. 72:24-73:19 (emphasis added).

28      [87]    Schmidt Dec. ¶¶ 12-13, Ex. J.

1  foreg, or otherwise encourage[es] the skipping of legally protected breaks."

2  *Brinker*, 53 Cal. 4th at 1040.

3          Here, Plaintiff admits that she was aware she had a right under the law to take

4  meal and rest breaks.  She admits that nobody ever told her that she should skip

5  breaks or told her that breaks were discouraged or prohibited.  She admits that she

6  was free to perform her projects any time she wanted within a two week window,

7  which would include taking a 30-minute or even an hour-long break between

8  different projects she performed in a day.  In addition, Susan Schmidt's declaration

9  is undisputed that projects with estimates over 3.5 hours had extra time built into the

10  estimate for purposes of covering anticipated rest break time.  Furthermore, if

11  employees called LMS to ask whether they could take a break, they would always

12  be encouraged to do so.  These undisputed facts establish, as a matter of law, that

13  Plaintiff was always "provided" meal and rest periods under Section 226.7.

14  Accordingly, LMS is entitled to summary judgment on the meal and rest claims.

15  **D.     LMS Is Entitled to Summary Judgment as to Plaintiffs' Claims That She Was Denied Expense Reimbursement**

16
17          Labor Code Section 2802 requires an employer to indemnify its employees

     for losses or expenditures "necessarily" incurred in the performance of their job

18  duties.  *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal. 4th 554, 568 (2007).  By

19  contrast, employers are not required to reimburse expenses that were merely

20  optional.  *See  Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341, 1358 (2012);

21  *Cassady v. Morgan, Lewis & Bockius*, 145 Cal. App. 4th 220, 230 (2006)

22  (identifying an essential element of a Section 2802 claim as whether "the

23  expenditures or losses were necessary."); *Novak v. Boeing Company*, 2011 U.S.

24  Dist. LEXIS 83031, *8-9 (C.D. Cal. Jul. 20, 2011) (declaring business phone

25  expenses incurred by workers non-reimbursable because expenses incurred as a

26  result of participation in a voluntary program "are not necessary expenditures.").

27          In addition, employers may reimburse expenses by inviting employees to

28  submit expenses on an expense report for reimbursement.  Where an employer has

1  such a system and the employee fails to submit expenses for reimbursement or

2  notify the employer of the expense, no violation of Section 2802 arises.  *See Wilson*

3  *v. Kiewit Pacific Co.*, 2010 U.S. Dist. LEXIS 133304, *13-14 (N.D. Cal. 2010) (no

4  obligation to reimburse expenses that were not submitted under company expense

5  reimbursement policy or otherwise disclosed to employer).  Under these principles,

6  Plaintiff's expense reimbursement claims fail as a matter of law.

7        **1.       Plaintiff Has No Claim For Reimbursement of Computer,
                    Camera, Telephone or E-Mail Access Because She Already**
8        **Owned All of Those Items for Personal Use**

9        A number of the expenses that Plaintiff pleaded in the Complaint do not

10 support a claim under Section 2802 in her case because she admits that she did not

11 need to make any additional expenditure for a business purpose during the relevant

12 limitations period (after January 1, 2008).  There are a number of items that she used

13 in connection with her job at LMS that she purchased ***prior*** to the limitations period

14 and used for ***personal*** use:

15       • Plaintiff owned her personal computer, printer and scanner since 2006,
           and used them for both personal and business use.
16
17       • Plaintiff had an e-mail address since 1998 that she used for both
           personal and business use.

18       • Plaintiff had internet access in her home that she used three hours per
           day (more time than she worked for LMS) for personal use.
19
20       • Plaintiff had a cell phone with a camera and also had regular access to
           her son's digital camera since 2006.

21       There is no authority that exists that California employers must pay

22 employees "rent" for items the employee owns for personal purposes but also uses

23 for work purposes.  This is distinguishable from a situation such as business mileage

24 arising from driving one's personal automobile for work purposes, where there are

25 specific costs necessarily incurred in using the product in the course of performing

26 the job.  Plaintiff has no evidence that, by receiving an e-mail from LMS for work

27 purposes, that increased the cost of her e-mail (or internet) charges from what she

28 paid for using these services for personal use.  Accordingly, Defendant is entitled to

summary judgment on any claim under Section 2802 premised on the argument that LMS had to reimburse Plaintiff for the above-listed expenses.

### 2. Plaintiff Has No Claim for Mileage Reimbursement Because All Mileage She Incurred Was Either Commute Miles or Not "Necessary" Within the Meaning of Section 2802

As stated above, the duty to reimburse under Section 2802 applies only to "necessary" expenses.  Mileage outside of a normal commute to and from work is subject to mandatory reimbursement only when it is "actually and necessarily incurred in performing [the] employment tasks."  *Gattuso,* 42 Cal. 4th at 567.[88] Here, however, there is no evidence that Plaintiff ever was required to drive for LMS other than to commute to and from where she performed merchandising work.

The only occasion she claims to have driven for LMS outside of her commute is when she, for her own convenience, performed service at her two Target stores on the same day and thus drove ten minutes between her two Target stores.[89]  If she had serviced those stores on separate days (which she was permitted to do), her drives to and from each store would be non-compensable commute miles.  Because Plaintiff has no evidence that she was ever directed to or required to service two stores in one day, she has no claim for reimbursement of the inter-store trips under Section 2802.

### 3. Plaintiff Has No Claim for Other Individual Expenses Because She Failed to Make use Of LMS's Expense Reimbursement Policy

As explained above, where an employer has a generalized expense reimbursement system that allows employees to submit miscellaneous expenses for reimbursement, an employee who fails to tell the employer about expenses cannot sue for violation of Section 2802.  *Wilson*, 2010 U.S. Dist. LEXIS 133304 at *13-14.  Plaintiff contends she incurred some petty expenses—printing less than $1 per week of instructions on her home printer or once purchasing a $3 duster—that she

---

[88]    Commute miles are not a reimbursable expense.  *See Sullivan v. Kelly Services*, 2009 U.S. Dist. LEXIS 96544, *15 (N.D. Cal. Oct. 16, 2009)

[89]    Pltf. Dep. 51:16-24 (drive between her two stores was ten minutes).

1  never tried to submit for reimbursement.  Indeed, Plaintiff testified that she never

2  discussed the topic of reimbursement with anyone at LMS.

3       However, it is undisputed that LMS's Employee Manuals have since 2008

4  invited employees to submit necessary expenses for reimbursement and that LMS

5  evaluates submissions of such expenses on a case-by-case basis.[90]  Because Plaintiff

6  never submitted the duster or printing expenses for possible reimbursement, LMS is

7  entitled to summary judgment on her Section 2802 claim.

8      **E.   LMS Is Entitled to Summary Judgment as to Plaintiff's Waiting Time Penalties Claim Because She Lacks Evidence That LMS**

9             **Willfully Failed to Pay Her All Wages Owed at Discharge**

10       Under Labor Code Section 203, when an employer willfully fails to pay a

11  terminated employee all wages owed within the time limits of Labor Code Section

12  201 or 202, then the employer shall owe "waiting time penalties" in the amount of a

13  day's pay for each day that payment is late, up to a maximum of 30 days.  *See*

14  *Mamika v. Barca*, 68 Cal. App 4th 487, 491-493 (1998).  However, an employer has

15  a complete defense to these penalties if it reasonably believed that no wages were

16  due at the time of termination.  *Smith v. Rae-Venter Law Group*, 29 Cal. 4th 345,

17  354 n. 3 (2002) ("'[A] good faith dispute that any wages are due will preclude

18  imposition of waiting time penalties under Section 203.").

19       Here, the evidence is undisputed that Plaintiff routinely reported far more

20  hours than she had actually worked, and she concedes that she does not know

21  whether she reported more hours than the total hours she worked.  Susan Schmidt

22  has submitted an uncontradicted declaration that LMS believed it had paid Plaintiff

23  for all the wages she was owed at the time of her termination in July 2011.[91]

24  Because there is no evidence either that Plaintiff was owed additional wages or that

25  LMS was unreasonable in believing that Plaintiff was owed no further wages, LMS

26  is entitled to summary judgment on Plaintiff's claim for waiting time penalties.

27    [90]   Schmidt Dec. ¶ 16.

28    [91]   Schmidt Dec. ¶ 4.

-22-

**F.      LMS Is Entitled to Summary Judgment as to Plaintiff's Wage Statement Claim Because Plaintiff Never Experienced an "Injury" Within the Scope of Labor Code Section 226**

To recover penalties under Labor Code Section 226(e) an employee must suffer injury as a result of the employer's knowing and intentional failure to comply with the statute.  *Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142 (2011).  As the *Price* court explained:

> "The injury requirement in section 226, subdivision (e), cannot be satisfied simply because one of the nine itemized requirements in section 226, subdivision (a) is missing from a wage statement. By employing the term 'suffering injury,' the statute requires that an employee may not recover for violations of section 226, subdivision (a) ***unless he or she demonstrates an injury arising from the missing information***. Thus, the 'deprivation of that information,' standing alone is not a cognizable injury."

*Id.* at 1142-43 (emphasis added; internal citations omitted).

Here, the undisputed material facts establish a lack of injury.  The only aspect of Plaintiff's wage statements that failed strictly to comply with the requirements of Section 226(a) is that her wage statements did not state the actual "hourly rate" that underlay the "hours" and "wages earned" entries on the wage statements.  Plaintiff admits, however, that she knew that detailed information as to the exact rate for each assignment she performed was readily available through the MARS system that she regularly used to perform her job.  Furthermore, Plaintiff admits that she never looked at her wage statements or had any issues with them.  Under those facts, Plaintiff did not ever experience an injury for purposes of Section 226. Thus, LMS is entitled to summary judgment on her claim in the same manner that Starbucks was entitled to summary judgment in *Price*.

**G.    LMS Is Entitled to Summary Judgment as to Plaintiff's Claim for That It Failed to Keep Proper Records of Her Meal Periods**

In Plaintiff's sixteenth cause of action, entitled "Failure to Record and Maintain Meal Period Records," she asserts that LMS has failed to keep records of meal periods she took in violation of the wage order which, in turn, allegedly violates Labor Code Section 1198.[92]  This claim fails on two separate grounds.

First, the allegations fail to state a claim for which a private right of action exists.  The Wage Order does not have any penalty provision for failure to *record* meal periods.  Labor Code Section 1198, which Plaintiff invokes, merely provides that "employment of any employee for longer hours than those fixed by the order or under conditions of labor prohibited by the order is unlawful."  Failing to record meal periods is not employing Plaintiff for excessive hours or under improper labor conditions.  *See Bright v. 99¢ Stores*, 189 Cal. App. 4th 1472, 1478 (2010) (failure to provide seats violated Section 1198 only because the provision of seats impacts a "condition of labor").

Second, Plaintiff testified at deposition that she never took a meal break at any time.[93]  Given that she took no meal breaks, LMS cannot be charged with failing to record meal breaks.  An employer cannot record that which does not exist.  That provides a separate basis for summary judgment on this claim.

**H.    LMS Is Entitled to Partial Summary Judgment as to Plaintiff's Derivative UCL and PAGA Claims**

Finally, Plaintiff has asserted derivative claims under the UCL and PAGA for each and every one of her defective statutory claims discussed above.  "Because the underlying causes of action fail, the derivative UCL and PAGA claims also fail."  *Price*, 192 Cal. App. 4th at 1147.

///

///

---

[92]    Complaint ¶¶ 179-181.

[93]    Pltf. Dep. 137:7-15.

## IV.    <u>CONCLUSION</u>

For each and all of the reasons discussed above, LMS respectfully requests that the Court grant its motion for summary judgment in its entirety.

Dated:  March 4, 2013               SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By     _____/s/ Thomas R. Kaufman_____
                    THOMAS R. KAUFMAN
                    DANIELLE L. LEVINE
                   Attorneys for Defendant
             LAWRENCE SERVICES COMPANY dba
             LAWRENCE MERCHANDISING SERVICES